DECISION AND JUDGMENT ENTRY
This is an appeal from an Adams County Common Pleas Court judgment that overruled objections to a magistrate's report filed by Laura Cole, defendant below and appellant herein, in her ongoing divorce action against her ex-husband, Roy Willman, plaintiff below and appellant herein.
The following error is assigned for our review:
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT/APPELLANT BY NOT FINDING THAT THE STOCK OPTIONS EXERCISED BY PLAINTIFF/APPELLEE HAD VALUE IN EXCESS OF THE PURCHASE PRICE AT THE TIME OF EXERCISE."
The parties were married on May 26, 1978, in Holdredge Nebraska. Two children were born as issue of that marriage (Yarrow Willman-Cole (d/o/b 3-4-79) and Skyler Willman-Cole (d/o/b 9-5-85)). On August 10, 1998, the parties filed a joint petition for dissolution of marriage together with an extensive "Separation Agreement" which provided, in pertinent part:
"(1) On or before the date of this Agreement, Husband shall provide to Wife's counsel a list of all stock options granted to him by [Cedar works], Inc. through March 31, 1996 whether such options were exercised or not. Such list shall include the date(s) such options were granted, number of shares covered by such option(s), strike date, strike price and (if appropriate) the date any of such options were exercised and the amount paid.
(2) In the event Husband or his successors, heirs, or assigns, shall exercise any of the unexpired options set forth in the list referred to in I.(1) above, then and in such event Wife shall promptly be paid anamount equal to 50% of the difference between the action value of theshares acquired and the amount paid." (Emphasis added.)[1]
The trial court granted the dissolution on September 15, 1998 and adopted the parties' agreement.[2]
In June of 1999, appellee exercised options to purchase 16 shares of Cedar Works, Inc. at $4,253 per share for a total of $68,048. Several months later, appellee exercised options to acquire 22 more shares at $6,102 per share for a total of $134,244. The total paid by appellee for all these shares was $202,292. At approximately the same time, the company was undergoing a reorganization and partial sale. Cedar Works, Inc. formed a new company, Cedar Works, LLC, to which it transferred all of its corporate assets and liabilities in exchange for 100 ownership units. On November 9, 1999, Cedar Works, Inc. entered into a "Unit Purchase Agreement" whereby it agreed to sell 40 units (or 40%) of Cedar Works, LLC, to Pennington Seed, Inc. (Pennington) for $6,000,000. The parties also entered into a "Unit Option Agreement" whereby Cedar Works, Inc. granted an option to Pennington to purchase the remaining 60 units (or 60%) of Cedar Works, LLC, within five years at either an option price of $14,000,000 or a formula price set out in the agreement.
On December 18, 2000, appellant filed a motion to determine the value of stock acquired by her ex-husband in 1999. Based on the Unit Purchase Agreement and the Unit Option Agreement between Cedar Works, Inc. and Pennington, appellant argued that the value of Cedar Works, Inc. (Cedar Works) was $20,000,000 at the time her ex-husband exercised his options. She further argued that his proportional ownership interest in that company, based on the 38 shares he purchased, was $642,978. After deducting the cost of exercising the options, her ex-husband was left with a value of $440,686. Appellant thus claimed that she was entitled to half that amount, or $220,343.
Appellee filed a memorandum contra and argued that his ex-wife had both misinterpreted the sales agreements between Cedar Works and Pennington as well as grossly overestimated the value of his stock. He argued that of the $6,000,000 paid for 40% of the company, $4,000,000 was actually for an option to buy the remaining shares and $2,000,000 was for the fractional share of the company. As for the $14,000,000 figure set out in the Unit Option Agreement, this constitutes the maximum sales price at which the remaining ownership units would be sold in five years. That actual sale figure, appellee explained, could be much less depending on company earnings during that time as reflected in the formula price. As for the value of the shares he acquired through exercising his options, appellant submitted an appraisal from "Business Valuations, Inc." which estimated that they were worth $200,982 or less than he actually paid for them. Thus, appellee concluded, he did not owe his ex-wife anything on the exercise of the options.
The matter came on for a hearing before a magistrate on February 14, 2001. Several witnesses testified to the transactions between Cedar Works and Pennington. Jim Obenshain, President of Cedar Works, testified that his company originally valued itself at $10,000,000 but, during sale negotiations, Pennington valued it at $5,000,000. The witness explained that of the $6,000,000 paid by Pennington under the Unit Purchase Agreement, $2,000,000 was for the 40% share of the company and $4,000,000 was for an option to buy the remaining 60% with the option price being deducted from amount paid for the remainder. With respect to the $14,000,000 to be paid for the remainder of the company, its corporate counsel, Scott Kadish, explained that figure as follows:
"* * * Cedar Works always said they would sell the whole company at any time if they could get 20 million dollars. That really was their goal, that they didn't want to sell it until they could get 20 million dollars. And so, um, what Cedar Works said is, you can buy our company at any time, the rest 60 percent, or any time that you want to give us 14 million, which would then equal a total of 20. Pennington said, well, but the company's not worth that, and at the end of five years if you haven't achieved that, then we want to be able to buy you out at the formula that we value your company at now, that we use when we buy all companies. Uh, and so that's where it ended up. Originally, it was, uh, I think, it was a three-year option, and we said we need longer time to build up the value, using the formula that you use. And so it was ultimately agreed to be a five year option term. So that Pennington Seed has the right, if at any time within five years to buy the remaining 60 percent at, at, uh, 14 million. However, at the end of five years, they can buy it at the formula. And the formula is six times earnings less bank debt, which is the formula they used to value the company at five million initially. And, um, so the idea is that Pennington Seed would, would look periodically and say, okay, does that formula mean that I pay less or more that 14 million? If the company really grows and produces, uh, increased earnings so that it would be over 14 they could, they would exercise at the 14, and if it was under 14 at the end of five years or, or, and all the way through, they would just wait and they would do the formula and whatever it yielded, which could be as little as 0, it yielded."
And do they get credit for four million dollars that they've already paid?
Yes. Except that we, Cedar Works doesn't have to re-pay if the number was 0, uh, and it produces actually a negative value for the remaining when you minus the four million, um, Cedar Works doesn't have to give it back. But you apply the formula six times earnings minus bank debt, multiply that by 60 percent, and that's what the whole purchase price is. And then you subtract four million from that."
Steve Santen, an employee with Business Valuations, Inc., testified that he had evaluated Cedar Works and the shares of stock acquired by appellee in 1999. The witness opined that based upon his calculations, those shares were worth less than what appellee had paid for them. Other than referencing figures in the aforementioned Unit Purchase Agreement and the Unit Option Agreement, appellant offered no appraisals or expert evaluations of her own to substantiate her claims that the company was worth $20,000,000 or that the stock acquired by her ex-husband had a value of $642,978.
The magistrate's June 22, 2001 decision found that the "value of stock options at time of transfer and exercise of option did not exceed price paid for same by [appellee]. This finding is result of hearing where only evidence of value of shares presented was that shares value did not exceed price paid." Thus, the magistrate held that appellant was not entitled to any payment from her ex-husband under the separation agreement and her motion should be dismissed.
The trial court's July 9, 2001 judgment adopted the magistrate's decision and ordering that appellee "need not pay" his ex-wife "anything based on the stock option transaction."
The same day, appellant filed objections to the magistrate's decision and argued that the most equitable way to value the company was based on the $20,000,000 from the Unit Purchase Agreement and Unit Option Agreement. Appellant further argued that the value of her ex-husband's stock should be a proportionate figure based on that amount. Appellee filed an opposing memorandum and, on October 23, 2001, the trial court overruled the objections. This appeal followed.
Before we review the merits of appellant's assignment of error, we first address a threshold procedural problem. Civ.R. 53(E)(3)(a) states that objections to a magistrate's decision must be filed within fourteen days of that decision. We note that the magistrate's decision in this case was filed June 22, 2001. Appellant did not file her objections until July 9, 2001. Thus, this filing occurred three days out of rule.[3]
When objections are filed out of rule, an appellant cannot assign as error the trial court's adoption of the magistrate's decision. See Civ.R. 53 (E)(3)(b); also see Ironton Edn. Assn. OEA/NEA v. Ironton CitySchool Dist. Bd. of Edn. (May 12, 1997), Lawrence App. No. 96CA23. Consequently, appellant's assignment of error is hereby overruled.
Moreover, assuming that the alleged error had been properly preserved for review, however, we would affirm the trial court's judgment. The parties' separation agreement called for appellant to be paid 50% of the difference between the actual value of shares acquired by her ex-husband through exercise of his stock options and the amount paid.[4] It is undisputed that appellee paid $202,292 for the stock. Thus, in order to determine if appellant was owed anything under the separation agreement, we must determine the value of the stock when it was acquired and whether that value exceeded the price paid for the stock.
Cedar Works is a closely held corporation. Its stock is not publicly traded. Therefore, a court may not value the stock simply by looking at its trading price on a recognized exchange. Rather a court must look to some derivative means of valuing the stock in relation to the company's value as an ongoing concern. Both sides have attempted to arrive at the stock's value and have focused their attention on the value assigned to it by Pennington for purposes of acquisition. Mr. Santen testified that he based his calculations on the Unit Purchase Agreement and the Unit Option Agreement between the companies and he arrived at a value less than the price appellee paid for the stock. Likewise, appellee testified that he paid more for the stock than its current value.[5] On the basis of this evidence, appellant is not entitled to any amount under the terms of the separation agreement.
Appellant counter argues that the company's value should be fixed at the $20,000,000 figure derived from the Unit Purchase Agreement and the Unit Option Agreement. She further argues that the proportional part of that value represented by the 38 shares of stock acquired by her ex-husband is $482,233.68, which exceeds the amount he paid for that stock by $440,686. Appellant concludes that she is entitled to half of this amount. We disagree.
Although the contracts between these corporations are somewhat convoluted, the explanations provided by the various witnesses at trial does square with language found in the four corners of those documents. The $6,000,000 initially paid for 40% of the company appears to have two components: one part is $2,000,000 paid for the fractional share of the company, and the other part is $4,000,000 paid for the option. Although these separate components are not specified per se in the Unit Purchase Agreement, the $4,000,000 is set out as a credit in the "formula price" for purchase of the remainder of the company in the Unit Option Agreement. Moreover, we disagree with appellant that the $14,000,000 "option price" in the Unit Option Agreement could be considered the value of the remainder of the company. Pennington did not agree to buy the remainder of the company at that price in 1999. Rather, it had the option to buy the remainder of the company for that price sometime in the next five years. Whether Pennington would exercise that option depends upon the actual value of the company at the time. If the remainder of the company was worth less than that amount, it obviously would not exercise the option. If the remainder of the company was equal to or worth more than 14,000,000, then Pennington could acquire the remainder at that price.
In the end, judgments will not be reversed long as they are supported by some competent and credible evidence. See Shemo v. Mayfield Hts.,88 Ohio St.3d 7, 10, 2000-Ohio-258, 722 N.E.2d 1018; Vogel v. Wells
(1991), 57 Ohio St.3d 91, 96, 566 N.E.2d 154; C.E. Morris Co. v. FoleyConstruction Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, at the syllabus. This standard is highly deferential and even "some" evidence is sufficient to sustain the judgment and prevent a reversal. Barkley v.Barkley (1997), 119 Ohio App.3d 155, 159, 694 N.E.2d 989; also see LivingWaters Fellowship, Inc. v. Ross, Scioto App. No. 00CA2714, 2000-Ohio-1973; Simms v. Heskett (Sep. 18, 2000), Athens App. No. 00CA20. In the case sub judice, both the magistrate's decision and the trial court's judgment are supported by the evidence adduced below. Appellant did not offer evidence of her own to rebut that evidence, or to establish a value for the stock that was different from the value testified to by the appellee or by Mr. Santen.
For all these reasons, we overrule appellant's assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Adams County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, J. Evans, J.: Concur in Judgment Opinion.
[1] Appellee was, at the time, a vice president and share holder in Cedar Works, Inc.
[2] For additional background information on this case, see Willman v.Cole, Adams App. Nos. 00CA702 00CA707, 2001-Ohio-2484.
[3] We parenthetically note that the three day mail rule of Civ.R. 6(E) does not extend the time for filing objections to a magistrate's decision. See Duganitz v. Ohio Adult Parole Auth., 92 Ohio St.3d 556,557, 2001-Ohio-1283, 751 N.E.2d 1058; also see Pulfer v. Pulfer (1996),110 Ohio App.3d 90, 92, 673 N.E.2d 656; Abate v. Abate (Mar. 29, 2000), Summit App. No. 19560; McDonald Co. Securities, Inc. v. Field (Aug. 8, 1998), Montgomery App. No. 16916.
[4] Appellant's assignment of error incorrectly argues about the value of the "stock options." We emphasize that it is the value of the stock acquired through those options, and not the options themselves, which are at issue in this case.
[5] Appellee testified that he did not know at the time that the stock was worth less than he paid for it, although he did know that the figures were "close." He explained that he bought the shares anyway "based on the assumption of our future ability to grow." If earnings of Cedar Works did not improve, the investment would be "a loss."